UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **United States of America,** | |
| Plaintiff, | |
| v. | **No. 1:19-cr-392** |
| **Derrick Claiborne**, | Judge Robert M. Dow |
| Defendant. | |

## Defense Sentencing Memorandum

Defendant Derrick Claiborne, through undersigned counsel, respectfully submits this sentencing memorandum. The defense recommends that the Court impose a total sentence of 180 months, allocated as follows: the mandatory minimum sentence of 120 months on Count 1; and the mandatory minimum of 60 months consecutive on Count 3; and 18 months on Count 2 to run concurrent to Count 1.

1. **Response to Government's objection to the PSR**[1]

The Government objects to the PSR's recommendation of a two-level reduction for acceptance of responsibility, on the ground that Mr. Claiborne proceeded to trial on Count 3. *See* Gov. Memo at 11. The objection is somewhat academic, given that even if the Court did not grant the reduction, Mr. Claiborne's sentencing guidelines would still be well below the mandatory minimum of 180 months that the Court must impose for Counts 1 and 3. *See* Gov. Memo at 12 (calculating a total offense level of 31, which with criminal history category 1 results in a guideline range of

---

[1] The Government filed its sentencing memorandum a few days before the due date, which allows the defense to respond to issues in this memorandum that it would normally address in a separate filing. The defense consequently does not anticipate filing a separate responsive memorandum as contemplated in the scheduling order. *See* [132].

108 to 135 months. Still, the issue is worth discussing because Mr. Claiborne's acceptance of responsibility can be considered under section 3353(a) separately from the formal guidelines analysis.

The Government contends that Mr. Claiborne should not receive acceptance credit because his decision to proceed to trial on Count 3 "constituted a challenge to the factual evidence of his guilt—the reason Claiborne possessed the firearms." Gov. Memo at 11. Yet the facts were functionally uncontested at trial, and there were no factual disputes for the Court to resolve in its ruling. *See* [130] (Memorandum Opinion and Order Following Bench Trial), at 8 ("In the post-trial briefing, the Government … and defense counsel engage in spirited debate over the inferences that the Court should draw from the essentially undisputed factual testimony and evidence at trial."). Moreover, two of the three elements of the section 924(c) charge were admitted in Mr. Claiborne's pretrial guilty plea to Counts 1 and 3. Consequently, the only issue for the Court to resolve was a legal one—whether "any of the three firearms [Claiborne] possessed in the apartment furthered, advanced, moved forward, promoted, or facilitated his heroin trafficking." [130], at 7.

This is precisely the kind of situation contemplated by the guidelines in which a defendant should receive credit for acceptance of responsibility despite proceeding to trial. Application Note 2 to USSG § 3E1.1 explains:

> In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or *a challenge to the applicability of a statute to his conduct*).

(Emphasis added.) The emphasized language above is directly on point here. The sole dispute at trial was whether the undisputed facts satisfied the legal standard

for the third element of Count 3. That is a legal question, not a factual one. The Court should overrule the Government's objection to a two-point reduction for acceptance of responsibility.

2. **Mr. Claiborne's criminal history is overstated**

Though Mr. Claiborne does not receive any criminal history points and is in criminal history category 1, his criminal history is worth discussing because it, like acceptance of responsibility as discussed above, can still be considered under section 3553(a). *See generally United States v. Mansfield,* 21 F.4th 946, 955–58 (7th Cir. 2021) (discussing in detail when and how a sentencing court may consider arrests that did not lead to a conviction). His last serious arrest occurred nearly twenty years ago, in 2004. Since that time, he has only been arrested for minor traffic offenses. The Probation Office makes much of Mr. Claiborne's criminal history in its recommendation, noting that he has been arrested 53 times and implying that the number of arrests demonstrates that Mr. Claiborne is incapable of leading a law-abiding life.

But the Court cannot overlook the fact that Mr. Claiborne is African American. In November 2017, the U.S. Sentencing Commission published Demographic Differences in Sentencing: An Update to the 2012 Booker Report, which found that black male offenders continue to receive sentences that are approximately 20% higher than similarly situated white male offenders, after controlling for a wide variety of other sentencing and demographic factors. The key findings note that this trend remains unchanged in recent years.[2] *See* Figure 1 (on next page).

While the guidelines are intended to function in a race-neutral, objective manner, structural disparities nonetheless creep in through the criminal history

---

[2] U.S. Sentencing Comm'n, Demographic Differences in Sentencing: An Update to the 2012 Booker Report (2017).

score. For example, for the three years ending in 2018, ABC News found that Black people are five to 10 times more likely to be arrested than White people, according to data reported to the FBI from police departments nationwide. *ABC News analysis of police arrests nationwide reveals stark racial disparity* (June 11, 2020).

> **Key Findings**
>
> Consistent with its previous reports, the Commission found that sentence length continues to be associated with some demographic factors. In particular, after controlling for a wide variety of sentencing factors, the Commission found:
>
> • **Black male offenders continued to receive longer sentences than similarly situated White male offenders.** Black male offenders received sentences on average 19.1 percent longer than similarly situated White male offenders during the Post-Report period (fiscal years 2012-2016), as they had for the prior four periods studied. The differences in sentence length remained relatively unchanged compared to the Post-*Gall* period.
>
> • **Non-government sponsored departures and variances appear to contribute significantly to the difference in sentence length between Black male and White male offenders.** Black male offenders were 21.2 percent less likely than White male offenders to receive a non-government sponsored downward departure or variance during the Post-Report period. Furthermore, when Black male offenders did receive a non-government sponsored departure or variance, they received sentences 16.8 percent longer than White male offenders who received a non-government sponsored departure or variance. In contrast, there was a 7.9 percent difference in sentence length between Black male and White male offenders who received sentences within the applicable sentencing guidelines range, and there was no statistically significant difference in sentence length between Black male and White male offenders who received a substantial assistance departure.

*Figure 1*

The increased rate of arrests can artificially inflate the criminal-history score of Black defendants, nullifying the objectivity of the guidelines' criminal-history score. In short, over policing of Black communities and higher arrest rates of Black people, particularly Black men, leads to a situation where Black defendants will consistently have higher criminal history scores and thus consistently higher guidelines than White defendants charged with the same offense.

Additionally, often overlooked in consideration of criminal histories are two important and intertwined factors: the "adultification" of Black children and the

over-policing of Black communities, which have been shown to lead to high levels of Black teens with multiple arrests for petty offenses, such as trespassing, gambling, loitering, and low-level marijuana, or drug possession prior to reaching adulthood.

Michelle Alexander examined mass incarceration and structural racial disparities in *The New Jim Crow: Mass Incarceration in the Age of Colorblindness*, which focused on the "war on drugs":

> Vast numbers of people are swept into the criminal justice system by the police, who conduct drug operations in <u>primarily</u> poor communities of color. They are rewarded in cash—through drug forfeiture laws and federal grant programs—for rounding up as many people as possible, and they operate unconstrained by constitutional rules of procedure that were once considered inviolate. Police can stop, interrogate, and search anyone they choose for drug investigations, provided they get "consent." Because there is no meaningful check on the exercise of police discretion, racial biases are granted free reign. In fact, police are allowed to rely on race as a factor in selecting whom to stop and search (even though people of color are no more likely to be guilty of drug crimes than whites)—effectively guaranteeing that those who are swept into the system are primarily black and brown."

*Id.* at 185. This book, while now several years old, paints an all-too-familiar picture of the Chicago area. Black communities remain inundated with a disproportionate number of police officers fighting the "war on drugs," using the "broken windows" theory of policing. Small issues, like gambling or trespassing, have been increasingly treated as problems that can only be dealt with in court, which begins a cycle of arrests and the creation of a lengthy criminal history for behavior that is not particularly serious, especially in teens.

Mr. Claiborne's early history fits this pattern. The PSR notes that Mr. Claiborne's first arrest was at the age of 12, when he was not even a teenager. PSR, ¶ 69. Many of his arrests over the ensuring years that did not lead to convictions include arrests on minor charges such as disorderly conduct (PSR ¶¶ 72, 102), criminal trespass (PSR ¶¶ 76, 109), driving without a license or insurance, or on a

suspended/revoked license (PSR ¶¶ 8, 81, 85, 106, 107, 110, 112, 117, 119, 121), and playing a game of chance (PSR ¶¶ 89). Most of his convictions are for petty offenses such as driving without insurance (PSR ¶¶ 51, 55, 58, 62, 63), trespass to land (PSR ¶ 61), driving on a suspended or revoked license (PSR ¶¶ 57, 58, 59, 60), and possession of a single marijuana cigar (PSR ¶ 53).

To be fair, there is no dispute that Mr. Claiborne was also arrested many times on more serious charges. But most were dismissed, or he was found not guilty. The point is that Mr. Claiborne was drawn into the criminal-processing system at an early age and frequently returned due to arrests on minor matters. He never escaped.

Probation also notes that Mr. Claiborne is or was a member of the Gangster Disciples based on law enforcement reports. The Chicago Police Department's gang database has been repeatedly shown to be inaccurate and unreliable, and the court should give no weight to this assertion. *See, e.g.,* Heather Cherone, *More Than 3 Years After Watchdog Warned Chicago Police Gang Databases Were 'Deeply Flawed,' New System Poised to Launch Despite Objections*, WTTW (Nov. 25, 2022). The Chicago Inspector General's 2019 audit of the database found that "the records were riddled with errors, ripe for abuse and disproportionately targeted Black and Latino Chicagoans." *Id.*; *see also* Matt Masterson, *Gang Database 'Strains Police-Community Relations' City Watchdog Says*, WTTW (Apr. 11, 2019).

While Mr. Claiborne's cases are too old to receive points toward his criminal history score, artificial inflation of his criminal history has nonetheless crept into the Probation Office's sentencing recommendation:

> In aggravation, the defendant has a criminal history that dates to 1994, when he was 18. He has established a consistent pattern of criminal and violent behavior since then, sustaining several convictions for drugs and guns. Although not convicted, Claiborne has approximately 53 arrests, most notably for drugs, guns, domestic violence, assault, criminal trespassing, disorderly conduct, aggravated assault, attempted murder, aggravated

> discharge of a weapon, and numerous traffic citations. The defendant has never served a term of incarceration, and previous sentences have not deterred the defendant from engaging in a life of criminal activity. He has shown little effort at becoming a productive member of society.

Sentencing Recommendation, at 2. The Government also argues that Mr. Claiborne's arrest history "demonstrate[s] a disrespect for the law and risk of recidivism that highlight the need for the sentence to deter him from continuing to commit crime in our community." Gov. Memo at 12. And this is even though, as the Government acknowledges, "this will be the first time Claiborne serves a significant prison term." *Id.*

This approach is an unsurprising result of the structural factors discussed above that lead to defendants from disadvantaged and minority backgrounds receiving higher sentences than similarly situated defendants who grew up in areas that were not saturated with gang violence and policing problems. The Court should therefore consider Mr. Claiborne's history of arrests with caution because it is not necessarily an accurate proxy for his actual criminal history. *See* USSG § 4A1.3(a)(3) ("PROHIBITION.—A prior arrest record itself shall not be considered for purposes of an upward departure under this policy statement.").

3. **Sentences of similarly situated defendants**

The probation officer recommended a sentence of 180 months. This recommendation is based primarily on the statutory mandatory minimums for Counts One and Three, which must run consecutively by statute. The Government asks the Court to impose a higher sentence of 195 months. *See* Gov. Memo at 2. The Government does not explain precisely how it arrived at this number but, given the consecutive mandatory minimums that the Court already must impose on Counts 1 and 3, the question the Court must decide is whether Mr. Claiborne

should receive additional time for Count 2 on top of the 15 years he must already serve.[3]

Sentencing data for the past five years (2018–2022) shows 62 defendants in the Northern District of Illinois who were sentenced under primary guideline USSG § 2K2.1 and were in criminal history category 1. Of those cases, two-thirds received a sentence of 24 months or less, with an average and median sentence length of 24 months and 18 months, respectively. *See* Figure 2.



*Figure 2*

---

[3] Note that "Counts One and Two would ordinarily group pursuant to §3D1.2(c) because one of the counts embodies conduct that is treated as a specific offense characteristic that is applicable to another count. However, pursuant to §2K2.4, Application Note 4 (regarding Count Three), no specific offense characteristics for possession, brandishing, use, or discharge of an explosive or firearm should be applied when determining the sentence for the underlying offense. For this reason, because of the non-applicability of the weapons enhancement, there is no longer a specific offense characteristic in one count that embodies the conduct of the other count, regarding Counts One and Two. Therefore, they cannot be grouped." PSR ¶ 18.

That is slightly higher than the Seventh Circuit overall, in which three-quarters of defendants received a sentence of 24 months or less, with an average and median sentence length of 19 months and 12 months, respectively. *See* Figure 3. Note that during the same five-year period for that same cohort, there were 5,895 cases in the Seventh Circuit, compared to only 62 in this district. The larger sample size may thus be more representative of the averages and medians for this type of crime.



*Figure 3*

Based on this data, a sentence on Count 2 of 87 months as the Probation Office recommends (Sentencing Recommendation, at 1) is far out of step with sentences for similarly situated defendants, even if it does run concurrently to Count 1. Instead, a sentence of 18 months concurrent with Count 1 would place Mr. Claiborne directly at the median for category 1 defendants sentenced for this type of crime.

4. **History and characteristics of the defendant**

Derrick was born and raised in Chicago. His mother was supportive and loving, but his father was absent from his life. He recalls seeing his father "nodding out" after using drugs on the few occasions Derrick visited him as a child. His father spent most of Derrick's life in and out of prison and Derrick has not had any contact with his father in many years.

Derrick struggled in school and left Proviso West High School before graduation. He is currently enrolled in GED classes at MCC and plans to complete his high school education before his release.

Empirical research indicates that children who experience adverse childhood experiences (ACEs) are far more likely to have negative outcomes in adulthood,



*Figure 4*

- 10 -
DEFENSE SENTENCING MEMORANDUM

including physical and mental health disorders and aggressive or criminal behaviors. *See* Figure 4.

Derrick scored a 4 out of 10 on the ACE Questionnaire. Though this score is relatively low, it does not mean that his experiences did not produce lasting effects. He experienced the collateral effects of his father's absence due to drug abuse and incarceration. While his mother fostered positive behavior modeling that provided some protective effect and increased his resiliency, because he did not receive therapy as a child, it is unsurprising that he began acting out at an early age.

The British Medical Journal [documented the mental and physical health effects that ACEs have on children and adults](). Children who experience 4 or more ACEs are 32.6 times more likely to experience learning and/or behavior problems as children and are less likely to complete high school than children with no ACEs. Derrick experienced learning difficulties and struggled in school. He did not complete high school and has not received a GED, though he has recently been working toward obtaining his GED. Similarly, children with more than four ACEs are 7.2 times more likely to experience high school absenteeism. Children with more than three ACEs are 4.5 times more likely to experience behavioral disorders which also affect school attendance and performance, like ADHD, depression, and anxiety than children with no ACEs.

Additionally, children are 1.9 times more likely to exhibit aggression or engage in physical fighting *per ACE* than children with no ACEs. Derrick's score of 4 ACEs means he was 7.6 times more likely to get into fights than children who experienced no ACEs.

The effects of ACEs carry over into adulthood, in both physical health and behavioral impacts. Adults who experienced four or more ACEs as a child are 2.2 times more likely to suffer from asthma and are 8.1 times more likely to perpetrate

violence against others. Derrick struggled with interpersonal violence as a young man, as evidenced by his arrest records.

Derrick became a father at 20 and maintains close relationships with his children. His adult children visit him regularly and they speak on the phone frequently. Derrick loves being a father. He supports his children and makes sure that their physical and emotional needs are met. His youngest son is twelve and lives in Atlanta with Derrick's fiancée. He talks to him on the phone as often as he's able to make calls to make sure he maintains a presence in his son's life, even though he's not able to be physically present.

Derrick also wants to help his mother, as she is nearing retirement. He is aware that it will be progressively harder for her to care for herself as she ages and hopes to be able to help her with anything she may need in the future. He realizes that he is lucky that she is healthy and active at present but knows that there will come a time when she needs more assistance in her day-to-day life.

Moving forward, Derrick hopes to pursue a commercial driver's license (CDL) and eventually open his own trucking company. He plans to marry his fiancée and move out of Chicago. His family stands ready to support him as well. His mother says that his whole family supports him and hopes that this Court will give him a second chance.

### 5. Deterrence does not require a lengthy sentence

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006).

This conclusion is borne out in the U.S. Sentencing Commission's March 2016 report, *Recidivism Among Federal Offenders: A Comprehensive Overview*. Among

the report's key findings is that "with the exception of very short sentences (less than 6 months), the rate of recidivism varies very little by length of prison sentence imposed (fluctuating between 50.8% for sentences between 6 months to 2 years, to a high of 55.5% for sentences between 5 to 9 years)."

More recently, the University of Chicago published a meta-analysis of the deterrent effect of custodial sentences. *See* Petrich, et al., *Custodial Sanctions and Reoffending: A Meta-Analytic Review* (Sep. 22, 2021). In their abstract, the study's authors summarized their findings:

> Previous narrative reviews and meta-analyses concluded that the overall effect of imprisonment is null. Based on a much larger meta-analysis of 116 studies, the current analysis shows that custodial sanctions have no effect on reoffending or slightly increase it when compared with the effects of noncustodial sanctions such as probation. This finding is robust regardless of variations in methodological rigor, types of sanctions examined, and sociodemographic characteristics of samples. All sophisticated assessments of the research have independently reached the same conclusion. The null effect of custodial compared with noncustodial sanctions is considered a "criminological fact." Incarceration cannot be justified on the grounds it affords public safety by decreasing recidivism.

Given the empirical evidence regarding the limited deterrent effect of custodial sentences, a sentence of 180 months is adequate but not greater than necessary to deter Mr. Claiborne. There is no additional deterrent effect, either general or specific, for a longer sentence.

6. **Recidivism risk**

Derrick is now 47 years old. He will likely be in his 60s when he completes a 180-month sentence. U.S. Sentencing Commission data shows that recidivism risk decreases with age, dropping sharply (-21.6%) after age 25. The recidivism rate for people who are 41–50 years old at the time of sentencing in criminal history category 1 is 6.9%. The reconviction recidivism rate for offenders in criminal history category 1 is a mere 4%. Phrased another way, **96%** of offenders in criminal

history category 1 do *not* reoffend. The reconviction recidivism rate for offenders with zero criminal history points is slightly lower at 3.6%[4].

Prior to his arrest and detention, Derrick was steadily employed. The rearrest rate for people in criminal history category 1 is 12.7%. Likewise, Derrick has been in a long-term relationship with his fiancée and they plan to marry once he has completed his sentence. Among defendants in criminal history category 1, the rearrest rate of people in long-term relationships is 12.9%. There are no indications that Derrick is using illegal drugs. The rate of rearrests of people with no history of illegal drug use in criminal history category 1 is 10.8%

The rearrest rate of people in offense level 26–30 is also relatively low. For those with a final offense level of 26–30 in criminal history category 1, only 18.9% are rearrested.

Based on all the factors present with Mr. Claiborne, the Court can confidently find that he poses little risk of reoffending after he is released from what will be a lengthy period of incarceration. Accordingly, the sentencing concerns of incapacitation and protecting the public from further criminal activities by the defendant beyond the mandatory minimums are slight in this case, which means the need for a lengthy prison sentence beyond what the Court is already required to impose is significantly diminished.

### 7. A fine is not appropriate

The guidelines note that the Court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." USSG § 5E1.2(a). Mr. Claiborne has no present income and thus has no ability to pay a fine. The Court appointed counsel to represent Mr.

---

[4] U.S. Sentencing Commission, *Recidivism and the First Offender*, at 13 n. 25 (May 2004).

Claiborne under the CJA due to his lack of financial resources. Moreover, Mr. Claiborne's income once released is uncertain, and it is unlikely that he will be able to pay a fine in the future. Consequently, the defense requests that the Court decline to impose a fine.

8. **Objections to discretionary conditions of supervised release**

*Objection to Mandatory Condition 6*: Although this case involves narcotics, Mr. Claiborne has no reported recent drug use. His last reported use of marijuana was approximately thirty years ago, and there is no evidence that he requires drug testing or treatment.

*Objection to Discretionary Condition 7*: Mr. Claiborne does not report any problematic drug or alcohol use. This condition is unnecessary.

*Partial objection to Discretionary Condition 16*: Mr. Claiborne objects to the requirement that Probation be allowed to visit him at work. Employers often view workplace visits as intrusive or disruptive to the workplace, even when they are aware that employees are under supervision, and often terminate employment after such a visit. This creates tension with the goals of rehabilitation and Discretionary Condition 4, that Mr. Claiborne seek and maintain employment. Probation can adequately supervise Mr. Claiborne with home visits, visits to community service locations, or visits at other reasonable locations specified by the supervising officer, including meeting with Mr. Claiborne near his workplace during his breaks, such as a coffee shop or restaurant.

*Objection to Discretionary Condition 23*: Mr. Claiborne plans to live with his fiancée and minor children upon his release. This condition fails to adequately protect the privacy rights of his fiancée and children who will live with Mr. Claiborne by allowing his probation officer to search the entire home on mere "reasonable suspicion" and requires nothing more than a warning from Mr.

Claiborne that this condition allows the probation officer to search the entirety of the home.

Imposition of this condition may result in an unstable housing situation for Mr. Claiborne, as other cohabitants may be reluctant to let him live with them if their belongings are subject to searches. Moreover, it is relatively easy for the probation officer to get a warrant from the court if they believe that Mr. Claiborne is violating the terms of his supervised release. This judicial oversight would protect the privacy rights of cohabitants while allowing probation to investigate alleged violations of supervised release.

Respectfully Submitted,

/s/ James G. Vanzant
Attorney for Derrick Claiborne

James G. Vanzant
BLAINE & VANZANT, LLP
922 Davis Street
Evanston, Illinois 60201
Tel.: (312) 788-7584
E-mail: jgv@blainevanzant.com